# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMAL SHARIF (A-8847), | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 12 C 2309 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| DR. PARTHASARATHI GHOSH, KEVIN HALLORAN, and WEXFORD HEALTH SOURCES, INC., a corporation, | ) ) ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Jamal Sharif, an inmate at Stateville Correctional Center ("Stateville"), suffered a knee injury while playing basketball in July 2010. Although he received some treatment, he filed this suit against Defendants Dr. Parthasarathi Ghosh, Kevin Halloran, and Wexford Health Sources, Inc. ("Wexford"), alleging that Defendants exhibited deliberate indifference to his serious medical needs. Dr. Ghosh, Stateville's former Medical Director, is sued in both his individual and official capacities, while Wexford, which provides health care services to inmates at Stateville, and Halloran, its Chief Executive Officer, are sued only in their official capacities. Before the Court is Halloran and Wexford's motion to dismiss [80]. The Court finds that Sharif has sufficiently alleged that Wexford maintains a policy or practice of deliberate indifference and may proceed on that theory against Wexford. Because Sharif's claim against Halloran is redundant of that against Wexford, however, the claim against Halloran is dismissed.

# BACKGROUND[1]

On July 29, 2010, Sharif injured his right knee while playing basketball. He placed a sick call request that day and was taken to the health care unit on July 31 to receive medical care. Because no doctor or physician's assistant was available, however, he was sent back to his cell. He was taken to the health care unit on August 4 for treatment, only to be sent back to his cell yet again without treatment. On August 13, Sharif was examined by Latonya Williams, a physician's assistant. PA Williams ordered an x-ray and a knee support for his right knee, and prescribed Tylenol. On October 10, Sharif wrote to PA Williams thanking her for the knee support but explaining that she never provided him with a permit to use it. That same day, he also wrote to Dr. Ghosh complaining that he remained in pain and requesting an MRI and a permit for a low bunk and low gallery. On October 26, while waiting at the health care unit, Sharif attempted to speak to Dr. Ghosh about his injury and request for an MRI, but Dr. Ghosh refused to speak with him.

Over the next two months, Sharif continued to file grievances and requests for medical treatment. On January 3, 2011, Sharif filed an emergency grievance requesting an MRI. On January 10, Sharif was finally examined by Dr. Ghosh, who scheduled Sharif for an MRI. On February 4, Sharif was taken to the health care unit for medical treatment, waited three hours, and was sent back to his cell without seeing a doctor. His next two scheduled doctor's appointments, on February 18 and 25, were canceled without explanation. On February 28, Sharif was seen by Dr. Ronald Schaefer for his annual check-up. Dr. Schaefer refused to

---

[1] The facts in the background section are taken from Sharif's First Amended Complaint and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). The Court also considers the documents attached to Defendants' motion to dismiss, for they are referenced in the First Amended Complaint and central to Sharif's claims. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).

examine Sharif's knee, however, claiming he was not an orthopedist. After filing several additional sick call requests in March and April that went ignored, Sharif again wrote Dr. Ghosh and filed another grievance requesting further medical treatment for his knee.

On April 27, 2011, an MRI was performed on Sharif's right knee. The MRI revealed tricompartmental degenerative joint disease, a medial meniscus tears, and medial collateral ligament sprain with mild surrounding edema. In May, Sharif wrote to Dr. Ghosh asking to be moved to a low gallery, but that request was ignored. Sharif also wrote to Dr. Richard Shute, who was then acting Medical Director at Stateville, asking to be seen by an outside knee specialist and to see the results of his MRI. In June and July, Sharif was examined by Dr. Bautista, who had replaced Dr. Shute as acting Medical Director. Dr. Bautista ordered seven weeks of physical therapy for Sharif's torn meniscus. On August 19, Dr. Imhotep Carter, Stateville's new Medical Director, examined Sharif and stated that if physical therapy was not successful, he would recommend surgery.

On August 25, Sharif wrote to Halloran describing his injury, stating that he had not received the MRI report, and requesting that Halloran order immediate surgery to correct Sharif's injured knee. Sharif never received a response. On September 10, Sharif sent a letter to Dr. Carter with a similar request, asking for the MRI results and to be seen by an outside orthopedic specialist. On September 15, Sharif saw PA Williams, who scheduled Sharif to receive a previously ordered cortisone injection. Sharif received this injection on September 29.

Over the next nineteen months, Sharif sent numerous requests for medical treatment, many of which were ignored. Ten of his appointments to see medical personnel were canceled during this time period without explanation. In May 2012, ten months after Dr. Bautista ordered physical therapy, Sharif finally received five sessions. In July, he was told he would not be

receiving any more sessions. That same month, his right knee support, which Williams had provided to him in August 2010, was confiscated because PA Williams had never given him a permit for it. He received a replacement only in March 2013. And although he was told on January 18, February 5, and March 20, 2013 that he would be considered for surgery if his knee pain did not subside after six weeks, those six weeks passed and he still has not been considered for or received surgery.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

To state a claim for deliberate indifference, Sharif must allege both (1) an objectively serious medical condition and (2) that Defendants acted with deliberate indifference to that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). With respect to his official capacity claims against Halloran and Wexford, Sharif must state facts indicating that Wexford

4

maintained a policy or custom that violated his right to adequate medical care, which caused him harm. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (private contractors that provide medical services to prisoners are treated like municipalities for purposes of § 1983 claims).

I. **Official Capacity Claim against Halloran**

Initially, the Court addresses Sharif's claim against Halloran. In Defendants' opening memorandum, they argue that Halloran should be dismissed because Sharif did not cure the deficiencies identified by the Court when it previously dismissed Sharif's claim against Halloran in his individual capacity. In response, Sharif confirms that he is only pursuing claims against Halloran in his official capacity. Doc. 86 at 2 n.1 & 7. Thus, the Court will not address Halloran's argument that claims against him in his individual capacity should be dismissed. But in reply, Defendants maintain that even if Sharif is only pursuing an official capacity claim against Halloran, he nonetheless must allege that Halloran was personally involved in the alleged violations. Because Sharif is seeking only injunctive relief from Halloran, Sharif need not allege that Halloran was personally involved in the alleged violations. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

Sharif's claim against Halloran in his official capacity is tantamount to a claim against Wexford. *Guzman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007) ("An official capacity suit is tantamount to a claim against the government entity itself."). Although two defendants are named, the claims against them are redundant. *See, e.g.*, *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) ("nothing was added" by suing the mayor in his official capacity as well as the city because suing the mayor in his official capacity only "is the equivalent of suing the city"); *Brown v. Chicago Bd. of Educ.*, --- F. Supp. 2d ----, 2013 WL 5376570, at *3 (N.D. Ill. Sept. 25, 2013) ("When both a local governmental entity and an individual is sued in his official capacity,

the suit against the officials is redundant and should be dismissed."). Thus, Halloran is dismissed from this suit.

## II. Official Capacity Claim against Wexford

Sharif alleges that Wexford maintains a policy or practice by which its employees fail or refuse to properly examine inmates with serious medical conditions and ignore or refuse inmate requests for medical care, medication, or to be seen by a doctor. He also alleges that Wexford maintains a policy or practice by which it fails to train its employees on how to process and treat inmates with serious medical conditions within an appropriate time and fails to properly staff the Stateville health care unit to ensure that inmates receive appropriate medical care within a reasonable time. He supports these allegations with not only his own experiences in attempting to get treatment for his knee pain while housed at Stateville but also with the findings of the John Howard Association ("JHA"), which conducted a monitoring visit of Stateville in July 2011. Among other findings, JHA reported that "[i]n the face of insufficient medical staffing and resources, there is little question that inmates with serious health problems are suffering and going without adequate treatment at Stateville." First Am. Compl. ¶ 61 (quoting JHA Monitoring Report at 3). Sharif also contends that Wexford's treatment does not comply with industry standards.

First, Wexford argues that Sharif's references to industry standards are irrelevant to his claim against it and should be stricken. Although mere negligence or medical malpractice does not amount to deliberate indifference, *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), deliberate indifference may be established by demonstrating departure from professional judgment, practice, or standards, making those referenced industry standards relevant, *see Gayton v. McCoy*, 593 F.3d 610, 622–23 (7th Cir. 2010) ("Deliberate indifference may be

6

inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." (quoting *Estate of Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996))).  Although Sharif has not specifically identified the industry standards he plans to rely on in his First Amended Complaint, notice pleading does not require him to do so.

Next, Wexford argues that by relying on the JHA report, Sharif has pleaded himself out of court.  According to Wexford, the JHA report found that the problems facing Stateville, including medical issues, are beyond the control of Stateville's staff and administration and concluded that it was the responsibility of Illinois' elected officials to reduce the state's prison population and provide Stateville with the funding to meet that population's basic needs.  But Wexford reads too much into the JHA report.  That report does not absolve Wexford of liability for the violations alleged here or conclusively establish that Sharif will not be able to show that Wexford maintains a policy or practice of deliberate indifference to the medical needs of Stateville inmates.  It does not purport to be an exhaustive report of who is responsible for the problems identified in the report or raised by Sharif here.  As Sharif points out in response, some of the findings, such as the fact that only thirteen of twenty-one authorized nurse positions were filled at the time of the JHA visit, suggest that inadequate staffing could be attributed to Wexford.  Thus, Sharif's reliance on the report to illustrate the shortcomings in medical care at Stateville by no means precludes his claim against Wexford and references to that report will not be stricken.

Finally, Wexford argues that Sharif's allegations regarding Wexford's failure to train, supervise, or discipline its employees should be stricken because such allegations essentially

7

seek to hold Wexford responsible for the actions of its employees. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (municipality cannot be held liable under § 1983 based on *respondeat superior*). But allegations of failure to train medical staff have been found to support a *Monell* claim. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (failure to train may serve as basis for *Monell* liability); *Lewis v. County of Henry*, No. 105CV0270JDTTAB, 2005 WL 3429253, at *4 (S.D. Ind. Dec. 12, 2005) (plaintiff stated claim for failure to train and/or supervise with respect to proper administration of medical care against municipal police department). Thus, the Court declines Wexford's request to strike the failure to train allegations, which properly form a part of Sharif's deliberate indifference claim.

When viewed as a whole, Sharif's allegations of a policy or practice are not conclusory or speculative, as Wexford argues. Viewed in a light most favorable to Sharif and with all possible inferences drawn in his favor, Sharif's allegations plausibly suggest that Wexford has a widespread custom or practice of treating inmates' medical needs with deliberate indifference. *See Neely v. Randle*, No. 12 C 2231, 2013 WL 3321451, at *6 (N.D. Ill. June 29, 2013) (allegations of routine delays, denials of medical care, and nonresponsiveness to requests for medical care were sufficient to state *Monell* claims against Wexford and other defendants); *Ford v. Wexford Health Sources, Inc.*, No. 12 C 4558, 2013 WL 474494, at *9 (N.D. Ill. Feb. 7, 2013) (allegations of delayed delivery of medical permits, failure to administer medication, and delayed scheduling of appointments sufficient to state *Monell* claim). Although discovery may prove otherwise, at this stage, Sharif has sufficiently alleged a policy or practice against Wexford to proceed with his deliberate indifference claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss [80] is granted in part and denied in part. Defendant Halloran is dismissed with prejudice. Defendants Dr. Ghosh and Wexford are given until April 15, 2014, to answer the First Amended Complaint.

Dated: April 1, 2014

SARA L. ELLIS
United States District Judge